UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

OMAR GOURZONG

Plaintiff,

-against-

THE CITY OF NEW YORK, POLICE OFFICER
DAVID BOWMAN (NYPD) SHIELD #16034,
POLICE OFFICER JOSEPH WERNERSBACH
(NYPD) SHIELD #6302, POLICE OFFICER AMJAD
KHAN (NYPD) SHIELD #16306, POLICE OFFICER
SHELDEN M. LESSEY (NYPD) SHIELD #1191,
SERGEANT "SMALLS" (NYPD SUPERVISING
OFFICER), AND NYPD POLICE OFFICERS JOHN
DOE #1-10 (THE NAME JOHN DOE BEING
FICTITIOUS, AS THE TRUE NAME(S) IS/ARE
PRESENTLY UNKNOWN),

Defendants.

---------------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 1 5 2011 ★

BROOKLYN OFFICE

Docket No.: *CV*

**COMPLAINT**

# CV 11 - 1877

**JURY TRIAL
DEMANDED**

**SUMMONS ISSUED**

**VITALIANO, J.**

GOLD, M.J

The Plaintiffs, complaining by his attorney, ANDREW L. HOFFMAN, ESQ.,
respectfully shows to this Court and alleges:

## JURISDICTION

1.  Jurisdiction is founded upon the existence of a Federal Question.

2.  This is an action to redress the deprivation under color of statute, ordinance,
    regulation, custom, or usage of rights, privileges, and immunities secured to the
    Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United
    States pursuant to 42 U.S.C. Section 1983 and arising under the law and statutes of
    the State of New York.

3.  Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this
    being an action authorized by law to redress the deprivation under the color of law,
    statute, ordinance, regulation, custom and usage of rights, privileges and immunities
    secured to Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of
    the United States.

1

## VENUE

4.      Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the events giving rise to the claim occurred in the Eastern District.

## PARTIES

5.      Plaintiffs OMAR GOURZONG, is a resident of Brooklyn, New York.

6.      Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and that at all times relevant all Defendant officers were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

7.      Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the NEW YORK CITY POLICE DEPARTMENT, including all the police officers thereof.

8.      Upon information and belief, at all times hereinafter mentioned, Defendant POLICE OFFICERS BOWMAN, WERNERSBACH, KAHN, LESSEY, SERGEANT "SMALLS," POLICE OFFICER(S) DOE #1-10 were employed by the Defendant, CITY OF NEW YORK, as members of its police department.

9.      Upon information and belief, at all times hereinafter mentioned, all Defendant Police Officers, be they known or unknown, worked out of the 70th Precinct in Brooklyn, in the City of New York—the same Precinct where several years earlier, ABNER LOUIMA was infamously taken, beaten and sodomized with a plunger by 70th Precinct police officers.

10.     The NEW YORK CITY POLICE DEPARTMENT is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the POLICE CHIEF THE NEW YORK CITY POLICE DEPARTMENT is responsible for the policies, practices, and customs of the NEW YORK CITY POLICE DEPARTMENT as well as the hiring, screening, training, supervising, controlling and disciplining of its police officers and civilian employees, and is the final decision maker for that agency.

2

11.     This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

12.     Individual Defendants in this action are being sued in both their individual and official capacities.

## STATEMENT OF FACTS

13.     In late 2009, police from the 70th Precinct in Brooklyn, NY—the same Precinct where several years earlier, ABNER LOUIMA was infamously taken, beaten and sodomized with a plunger—began an organized harassment campaign aimed at the Plaintiff Omar Gourzong.

14.     The above-referenced defendant NYPD officers, both known and unknown, would routinely stop/search Omar, absent any reasonable suspicion, and frequently torment him with taunts to the effect of, "You better watch your back, Omar," "We're going to get you," "You better hope you're from this country, because if you're not, we're going to get you deported," "Eventually, we're going to get your black ass, Omar."

15.     After approximately 6 months of not being able to leave his house without the constant fear of this relentless harassment, Mr. Gourzong was arrested by the defendants.

16.     More specifically, on May 1, 2010, Mr. Gourzong was arrested by 70th Precinct officers, under the pretext that Defendant Officer Wernersbach had personally witnessed Mr. Gourzong selling crack cocaine earlier that morning, and that said cocaine was later recovered on the ground and identified by Defendant Officer Khan.

17.     Apparently hoping to inflict maximum humiliation on Mr. Gourzong, 70th Precinct police thoroughly and repeatedly searched him at the site of his arrest; nevertheless, nothing illegal was found on his person.

18.     When defendant officers finally delivered Mr. Gourzong to the 70th Precinct, the first thing they did was march him straight into a small public restroom near an area heavily trafficked by other officers and the general public.

3

19.     Leaving the door open, again to ensure maximum humiliation, 70th Precinct officers ordered Mr. Gourzong to strip naked, squat, and begin aggressively probing his own anus and rectum with his fingers. As precinct officers and members of the general public looked on, 70th Precinct officers laughed and jeered, saying in sum and substance, "Make like your ass is an ATM machine and your fingers are the card!"

20.     This relentless abuse at the hands of 70th Precinct officers, which was all too reminiscent of similar abuses infamously inflicted on Abner Louima several years earlier, lasted approximately 20 minutes.

21.     No contraband was recovered from Mr. Gourzong's anus and/or rectum.

22.     Apparently frustrated by the nonexistence of any contraband on (or within) Mr. Gourzong, Defendant Officer Bowman, who had been among Mr. Gourzong's chief tormentors over the previous several months, decided to take matters into his own hands.

23.     Without explanation or provocation, Defendant Bowman unlocked and entered the "bullpen" cell where several other arrestees were being held; once inside, he began searching random arrestees until he came upon an abandoned coat he found on the floor. From out of the coat, Defendant officer Bowman pulled a bag of what appeared to be crack cocaine, held it up, and brazenly announced in front of multiple witnesses, something to the effect of "Ha! Look what I just found on *you*, Omar!"

24.     Mr. Gourzong, who did not own the jacket in question, and hadn't even set foot in the bullpen, having been whisked directly to the restroom for his 20 minute "cavity search," was shocked and horrified by the brazen and deliberate nature of Defendant Bowman's shameless evidence planting.

25.     Mr. Gourzong was ultimately charged with two counts of PL 220.16 (Criminal Possession of a Controlled Substance in the Third Degree), one count of PL 220.39 (Criminal Sale of a Controlled Substance in the Third Degree), and two counts of PL 220.03 (Criminal Possession of a Controlled Substance in the Seventh Degree).

26.     After spending six days in jail due to said charges, the Grand Jury, upon hearing testimony regarding the terrible abuses suffered by Mr. Gourzong at the hands of the Defendant Officers, and in particular, Defendant Bowman, summarily rejected every one of the prosecution's claims, rendering a verdict of "No True Bill" with respect to the entire matter.

4

27.    Unfortunately, the Grand Jury's verdict seemed to only inflame the abject hatred of the Defendant officers even more—and their harassment of Mr. Gourzong, his friends and family resumed almost immediately, and with even more intensity.

28.    This harassment ultimately culminated in Mr. Gourzong's being arrested just days later.

29.    This time, Mr. Gourzong was apprehended, in large part, for allegedly assaulting a police informant named "Gary Gracious" who aggressively sought to compel Mr. Gourzong to give him drugs to the point that Mr. Gourzong felt physically threatened, and made deliberate efforts to get away from him.

30.    However, as alleged by Informant "Gracious," Mr. Gourzong punched Gracious and chased him down the street with a knife, threatening to kill him.

31.    Charges stemming from that event were subsequently dropped, and Gary Gracious has not been heard from since.

32.    No knife was ever recovered by the Defendant police.

33.    To this day, Defendant officers from the 70th Precinct continue to harass Mr. Gourzong with verbal taunts, unlawful stops and searches, unwarranted surveillance, and unlawful and unwarranted stops, searches, and surveillance of his acquaintances.

34.    A notable example includes police deliberately and slowly driving behind Mr. Gourzong's girlfriend on several occasions in recent months, roving about in silence on dimly lit, isolated streets, occasionally taunting her about "getting" Mr. Gourzong.

35.    Another notable example involved Defendant Bowman in particular.  In or about January 2011, Mr. Gourzong was walking through his Brooklyn neighborhood when he happened upon an acquaintance.  Mr. Gourzong greeted said acquaintance with a friendly fist bump as said acquaintance boarded a commuter van.  As the commuter van pulled away, 70th Precinct police, including Defendant Bowman, stopped the vehicle, subjecting Mr. Gourzong's acquaintance to an unauthorized stop and search.

36.    There is no evidence that any of the Defendant officers has ever been disciplined for their flagrant and ongoing violations of Mr. Gourzong's rights.

37.    Mr. Gourzong no longer feels free to leave his home alone, for fear that 70th Precinct officers will descend upon him, once again fabricate a reason to stop and/or

arrest him, and he will be without a witness to testify to the Defendants' deliberate and malicious misdeeds.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST
## ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### —False Arrest and Imprisonment—

38.     Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 37.

39.     The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials, and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

40.     The actions of Defendant Officers Bowman, Wernersbach, Khan, Lessey, Smalls and Doe #1-10 detailed above violated Omar Gourzong's rights under the United States Constitution.  Given the total absence of any legal justification for Defendant officers' ongoing and excessive harassment and blatant manufacturing/planting of evidence, it was not objectively reasonable for the Defendant officers to arrest Mr. Gourzong for anything on May 1, 2010.

41.     Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of Mr. Gourzong.

42.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

43.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Omar Gourzong has been irreparably injured.

6

## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Malicious Prosecution-

44.     Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 37.

45.     The Fourth Amendment of the United States Constitution protects citizens from overzealous and malicious prosecution by government officials without probable cause.

46.     Omar Gourzong was prosecuted, without probable cause, relative to multiple false and scurrilous charges stemming from his May 1, 2010 arrest.

47.     The charges listed above resulted in a loss of liberty for Omar Gourzong, as he was incarcerated for approximately 6 days as a result of these maliciously manufactured and otherwise improper charges, and was forced to fight said charges before a Grand Jury, incurring substantial financial, psychological, and emotional costs as a direct result.

48.     Mr. Gourzong's criminal proceeding was unambiguously terminated in favor of Mr. Gourzong.

49.     Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Mr. Gourzong.

50.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

51.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Omar Gourzong has been irreparably injured.

7

## AS AND FOR THE THIRD CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Illegal and Improperly Performed Strip Search-

52.     Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 37.

53.     The Fourth Amendment of the United States Constitution protects an arrestee's privacy interests in his person and prohibits bodily intrusions that are not justified under the circumstances, or which are made in an improper manner.

54.     Despite having no reason to believe Omar Gourzong might have hidden contraband up his rectum, in a horrific homage to the terrible abuses suffered by Abner Louima in the very same precinct, Mr. Gourzong was forced to strip naked in a public restroom with the door open to the passersby, and ordered to manually probe his anus and rectum for some 20 minutes as Defendant officers laughed and taunted him.

55.     Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Mr. Gourzong.

56.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

57.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Omar Gourzong has been irreparably injured.

## AS AND FOR THE FOURTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Failure to Intercede-

58.     Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 37.

59.     The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials, and prohibits law

enforcement officers from arresting and detaining individuals in the absence of appropriate authorization. The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

60.    The actions of Defendant Officers Bowman, Wernersbach, Khan, Lessey, Smalls and Doe #1-10 detailed above violated Omar Gourzong's rights under the United States Constitution. It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

61.    Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of Mr. Gourzong.

62.    This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

63.    As a direct and proximate result of the unconstitutional acts described above, Plaintiff Omar Gourzong has been irreparably injured.


## AS AND FOR THE FIFTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Conspiracy to Violate Plaintiffs' Civil Rights-

64.    Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 37.

65.    Defendant officers acting under color of state law in both their individual capacities and as agents for the City of New York, conspired together, reached a mutual understanding, and acted in concert to undertake a course of conduct violative of Plaintiffs' civil rights by:

a.    Agreeing to engage in an organized harassment campaign against the Plaintiff and/or his acquaintances.

b.    Agreeing to intentionally fabricate a legal justification for the unauthorized arrest of the Plaintiff.

9

    c.  Agreeing to deliberately and maliciously fabricate evidence against the Plaintiff.

    d.  Agreeing to falsely arrest and imprison the Plaintiff as aforedescribed.

    e.  Agreeing to contrive false charges against the Plaintiff, and to cause him to be maliciously prosecuted as aforedescribed.

66.    This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

67.    Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Mr. Gourzong.

68.    As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

### AS AND FOR THE SIXTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFFS AGAINST DEFENDANTS
### NIKKI PRASAD AND THE CITY OF NEW YORK

**Violation of Constitutional Rights Under Color of State Law**

**-Implementation of Municipal Policies, Practices, and Customs that Directly Violate Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and Failure to Train and Supervise Employees Under Color of State Law-**

69.    Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 37.

70.    Upon information and belief, Defendant City of New York and Doe #1-10 who were supervisors and final decision makers, as a matter of policy, practice, and custom, have acted with a callous, reckless and deliberate indifference to the Plaintiff's constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, including not making warrantless searches of citizens absent reasonable suspicion and/or probable cause, and not making arrests without probable cause to believe a crime has been committed.

10

71.     In the alternative, and upon information and belief, Defendants City of New York and Doe #1-10 instituted policies addressing the topics listed above, but through deliberate indifference to the same culture of gross negligence, carelessness, and malice displayed by 70th Precinct officers in the infamous Abner Louima case, and/or improperly pressuring officers to meet certain arrest quotas[1] regardless of whether probable cause was present, demonstrated a willful indifference to the constitutional rights of the Plaintiff.

72.     Defendant(s) also, upon information and belief, demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise officers at the 70th Precinct.

73.     The policies, procedures, customs and practices of the above-referenced Defendants violated the Constitutional rights of the Plaintiff under the Fourth Amendment of the United States Constitution.

74.     This conduct on the part of Defendants also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

75.     As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.


## DEMAND FOR PUNITIVE DAMAGES

76.     The actions of Defendants described herein were extreme and outrageous, and shock the conscious of a reasonable person. Consequently, an award of punitive damages is appropriate to punish the Defendants for their cruel and uncivilized conduct. The Plaintiff does not seek punitive damages against the City of New York.


## DEMAND FOR TRIAL BY JURY

77.     The Plaintiff hereby demands a trial by jury.

---

[1] See e.g., NYPD Officers Under "Quota" Pressure, WABC News, March 3, 2010; NYPD Officer Claims Pressure to Make Arrests, WABC News Special Report, March 3, 2010 ["At the end of the night you have to come back with something. You have to write somebody, you have to arrest somebody, even if the crime is not committed, the number's there. So our choice is to come up with the number,' said Officer Polanco."]; real and true copies of both articles are attached hereto as **Exhibit A.**

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Omar Gourzong requests that this Honorable Court grant him the following relief:

A. A judgment in favor of the Plaintiff against Defendant officers for compensatory and punitive damages in an amount to be determined by a properly charged jury;

B. A judgment in favor of the Plaintiff against Defendant City of New York for compensatory damages in an amount to be determined by a properly charged jury;

C. A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

D. Any other relief this Court finds to be just, proper, and equitable.

Dated: New York, New York  
      April 15, 2011

Respectfully Submitted By:

Andrew L. Hoffman, Esq.  
EDNY Bar Code Number: AH9502  
Of Counsel,  
The Law Office of Jeffrey Chabrowe, P.C.  
Attorney(s) for the Plaintiff  
C/O The Law Offices of Andrew L. Hoffman, PLLC  
1501 Broadway, 12th Floor  
New York, New York 10036  
T:    (347) 262-8052  
E:    ahoffman@andrewhoffmanlaw.com

12

# EXHIBIT A

Investigations 🔊
# NYPD Officers under "quota" pressure
Wednesday, March 03, 2010



TAGS: nypd, bronx, new york city, investigations, jim hoffer
Comment Now   Email   Print   Report a typo 🖼

BRONX (WABC) -- Some police officers at the 41st precinct in the Bronx say they are under constant pressure to make a quota.

According to them, it's 1 arrest and 20 summonses per month, better known as 1 and 20.

"If you think 1 & 20 is breaking your balls, guess what you're going to be doing? You're going to be doing a lot more," an officer is heard saying on tape.

The audio tape that we obtained of a roll call underscores the emphasis that the precinct seems to place on numbers.

"Next week, 25 and 1, 35 and 1 and until you decide to quit this job to go work as a Pizza Hut deliveryman, this is what you're going to be doing until then. Do we understand each other?" the patrol supervisor is heard saying.

It's that relentless pressure to write summonses that some young people in the community say has led to them being repeatedly stopped, questioned and even frisked for no reason.

"They have you against the wall. They pat you down," Emmanuel Candelario of the Bronx said.

The Fordham graduate student says he's been stopped and frisked at least 10 times in the last 5 years.

"People feel unsafe when police are around because anytime they might get stopped, they might get frisked," he said.

Recently released data, show the NYPD stopped and questioned more people last year than in any year since the department began keeping records. A total of 575-thousand people, 87 percent of them minority. Only around two percent of the stops yielded drugs, guns or other law enforcement benefit.

"Nine out of 10 times they stop someone, they get it wrong. They're stopping an innocent person," Darious Charney of Center for Constitutional Rights said.

The NYPD would argue that no one is stopped without reason, but the circumstances often given on official stop and frisk forms seem purposefully vague, such as stopping someone for "furtive movements" or for "wearing clothes commonly used in a crime." The Center for Constitutional Rights says the NYPD is sowing the seeds of deep resentment.

"It's damaging because it builds so much distrust between the police and the communities they're policing," Charney said.

Writer and poet, Frantz Jerome has lost count of the number of times he's been stopped.

"They patted me down, had me turn around put my hands on the store's gate," Jerome explained. "I get stopped, violated and sent on my way. All I could think of was how is this any different than the sixties?"

The NYPD denies they have quotas. Deputy Commissioner Paul Browne did tell us that "police officers, like others who receive compensation, are provided productivity goals and they are expected to work." Some crime experts would also argue that the NYPD's aggressive stop and frisk policy has played a key role in making New York the safest large city in the country.

But a Bronx Police officer, tired he says of harassing innocent, mostly minority men gave us a rare, on-camera interview to expose what he calls out of control stop and frisks fueled by a department's obsession with numbers.

"I guess it's unlawful for you to have your hand in your pockets. Or, I guess it's unlawful for you to walk home from school or go to the store. Is there a law that prevents anyone from doing that? Not that I know about. And is that a reason to go through people's pockets and search them and do all these things? Absolutely not," Officer Adil Polanco said.

Officer Polanco is on modified duty for disobeying orders in a dispute about going to the hospital with his partner who had become ill.

One other note, in 2009 nearly half of those stopped and frisked were, according to police, stopped because of "furtive movements."

If you have a tip about this or any other issue you'd like investigated, please give our tipline a call at 877-TIP-NEWS. You may also e-mail us at the.investigators@abc.com and follow Jim Hoffer on Twitter at twitter.com/nycinvestigates

(Copyright ©2011 WABC-TV/DT. All Rights Reserved.)

Get more investigations »

TAGS: nypd, bronx, new york city, investigations, jim hoffer

Comment Now   Email   Print   Report a typo

Recommend   Sign Up to see what your friends recommend.

Investigations

# NYPD Officer claims pressure to make arrests
Wednesday, March 03, 2010



TAGS: nypd, new york city, investigations, jim hoffer
Comment Now   Email   Print   Report a typo

NEW YORK (WABC) -- An Eyewitness News investigation talks to a police officer who reveals the pressure they are under to make quotes.

When Officer Adil Polanco dreamed of becoming a cop, it was out of a desire to help people not, he says, to harass them.

"I'm not going to keep arresting innocent people, I'm not going to keep searching people for no reason, I'm not going to keep writing people for no reason, I'm tired of this," said Adil Polanco, an NYPD Officer.

Officer Polanco says One Police Plaza's obsession with keeping crime stats down has gotten out of control. He claims Precinct Commanders relentlessly pressure cops on the street to make more arrests, and give out more summonses, all to show headquarters they have a tight grip on their neighborhoods.

"Our primary job is not to help anybody, our primary job is not to assist anybody, our primary job is to get those numbers and come back with them?" said Officer Polanco.

Eyewitness News asked, "Why do it?"

"They have to meet a quota. One arrest and twenty summonses," said Officer Polanco.

This audio recording exclusively obtained by Eyewitness News seems to back up Officer Polanco's assertion of a quota. You can listen to one officer as he lectures his rank and file officers during roll call at the 41st precinct.

"Things are not going to get any better. It's going to get a lot worse," said a police officer.

He lays out clearly that they need to bring in the numbers.

"If you think 1 and 20 is breaking your balls, guess what you're going to be doing. You're gong to be doing a lot more, a lot more than what they're saying," said the officer.

In another recording, the 41st Precinct Patrol Supervisor appears to step up the pressure to write more and more summonses:

"Next week, 25 & 1, 35 & 1, and until you decide to quit this job to go to work at a Pizza Hut , this is what you're going to be doing till then. Do you understand?" asked the patrol officer.

"He's being clear, the only choice that we have is to do it," said Officer Polanco.

Eyewitness News asked, "Are you telling me they're stopping people for no reason, is that what you're saying?"

"We are stopping kids walking upstairs to their house, stopping kids going to the store, young adults. In order to keep the quota," answered Officer Polanco.

"Yeah, they locked us up for nothing," said Zebulun Colbourne.

The Colbourne brothers say they and three other friends were the victims of quotas. All were arrested a few months ago after one of them had fallen while racing each other.

Eyewitness News asked, "You fell and that's how you hurt your eye?"

"Yeah, and they just wanted to arrest us. I told them I fell but that didn't matter to them," said Elijah Colbourne.

All five were accused of engaging in tumultuous and violent conduct that caused public alarm, given a summons for unlawful assembly and locked up overnight.

Eyewitness News asked, "So you're locked up waiting to see the judge, right?"

"Yeah," answered the Colbourne brothers.

Eyewitness News asked, "Then what do they do?"

"We don't see the judge, they let us out the back door after they kept us for a day and some change," said Elijah Colbourne.

The charges were dropped, but Officer Polanco says the patrolman still got 5 summonses toward their monthly quota.

"At the end of the night you have to come back with something. You have to write somebody, you have to arrest somebody, even if the crime is not committed, the number's there. So our choice is to come up with the number," said Officer Polanco.

One Police Plaza declined our requests to interview the 41st precinct commander. But, Deputy Commissioner Paul Browne said, "Police Officers like others who receive compensation are provided productivity goals and they are expected to work."

Officer Polanco says if they are just goals, why are officers who fail to make them, re-assigned to different shifts or relocated far from home.

It's the consequences of not making the numbers or quotas, he says, that forces officers to give out bogus summonses.

"I cannot be more honest than I've been. There's no reason for me to lie, there's no reason for me to get into the trouble I am, cause I just could've kept quiet and made the money," said Officer Polanco.

If you have a tip about this or any other issue you'd like investigated, please give our tipline a call at 877-TIP-NEWS. You may also e-mail us at the.investigators@abc.com and follow Jim Hoffer on Twitter at twitter.com/nycinvestigates

(Copyright ©2011 WABC-TV/DT. All Rights Reserved.)

Get more Investigations »

TAGS: nypd, new york city, investigations, jim hoffer

Comment Now   Email   Print   Report a typo

Recommend    58 recommendations. Sign Up to see what your friends recommend.